# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

MATTHEW D. CLARK,          )
        Plaintiff,         )
                  )
     v.               )
                  )     CAUSE NO.: 2:11-CV-300-PRC
MICHAEL J. ASTRUE,         )
Commissioner of the Social Security     )
Administration,          )
        Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Matthew Clark on August 19, 2011, and Plaintiff's Memorandum in Support of Summary Judgment or Remand [DE 18], filed by Plaintiff on February 17, 2012. Plaintiff requests that the decision of the Administrative Law Judge denying his supplemental security income and disability insurance benefits be reversed or, alternatively, remanded for further proceedings. On April 19, 2012, the Commissioner filed a response, and on August 3,2012, Plaintiff filed a reply. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On February 28, 2007, Plaintiff filed concurrent applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") with the U.S. Social Security Administration ("SSA") alleging that he became disabled on January 1, 2003, due to back and knee impairments and arthritis, multiple sclerosis, mini-strokes, migraine headaches, and anxiety. Plaintiff's applications were denied initially on May 21, 2007, and again upon reconsideration on August 3, 2007.

On April 14, 2009, Administrative Law Judge ("ALJ") Paul Armstrong held a video hearing at which Plaintiff and a vocational expert ("VE") testified. On May 1, 2009, the ALJ issued a decision finding Plaintiff not disabled and denying both his SSI and DIB.  The ALJ made the following findings under the required five-step analysis:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc arthritis, arthritis in the knees, multiple sclerosis, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

      Non severe impairments: The undersigned has reviewed the claimant's allegations and has noted alleged depression and anxiety.  However, the evidence failed to show that these impairments meet the level of severity needed to be considered a severe condition.  The claimant has only mild limitations in activities of daily living, no social limitations and mild limitations in concentration persistence and pace.  The claimant has had no episodes of decompensation as contemplated by the "B" criteria of Listings 12.04 and 12.06.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant must have a sit/stand option.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 3, 1979 and was 23 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On May 1, 2009, Plaintiff filed a request for review, which the Appeals Council denied on May 18, 2011, leaving the ALJ's decision the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A.    Background

Plaintiff was born on May 3, 1979. He was 29 years old when the ALJ issued his decision and 23 years old on the alleged disability onset date. Plaintiff has two children who live with their respective mothers. He has a high school education.

### B.    Medical Evidence

#### 1.   *Physical Health*

In 2003 and 2004, Plaintiff sought treatment for chronic lower back pain and severe migraine headaches, and diagnostic testing indicated the likely presence of multiple sclerosis. Initially, in

February 2003, Plaintiff saw his neurologist, Dr. Michael Shaenboen, who noted in Plaintiff's treatment record that he had recently tripped and fallen in his home and, subsequent to that fall, he passed out several times at work and was treated at the emergency room. He indicated that Plaintiff had a number of impairments, including a history of migraine headaches triggered by stress, L5-S1 radiculopathy with disc herniation, and Osgood-Schlatter disease.[1] Additionally, Dr. Shaenboen noted that a January 2002 MRI of the brain revealed a "white matter signal abnormality with no associated mass effect or enhancement" and recommended that Plaintiff undergo further medical evaluation. AR 475.

On May 18, 2004, Plaintiff was hospitalized for intractable lower back pain that radiated down his right leg and into the groin region. A CT of the lumbar spine showed a "posterior bulging disc with mild posterior disc herniation at L5-S1 and mild encroachment on corresponding foramina." AR 404. On May 29, 2004, Plaintiff received a lumbar epidural steroid injection because he complained of "sharp, shooting, burning, and constant" lower back pain. AR 390. In June 2004, Plaintiff was treated again for severe back pain that radiated to his right lower extremity. In July 2004, an MRI of the lumbar spine confirmed a "minimal disc bulge at L5-S1 with minimal central herniation" but indicated that there was no evidence of central stenosis. AR 386.

On August 13, 2004, Plaintiff underwent back surgery, which entailed a right microlumbar discectomy at L5-S1 and a partial medial facetectomy. Several weeks after the surgery, Plaintiff continued to experience severe lower back pain that was exacerbated by movement and sensitive to palpitation. As a result, he was prescribed narcotic pain medications and physical therapy. On

---

[1] Osgood-Schlatter disease "can cause a painful lump below the kneecap in children and adolescents experiencing growth spurts during puberty." *See* http://www.mayoclinic.com/health/osgood-schlatter-disease/DS00392 (last visited on Oct. 26, 2012). This disease "occurs most often in children who participate in sports that involve running, jumping and swift changes of direction—such as soccer, basketball, figure skating and ballet." *Id.*

September 9, 2004, after falling in his home, Plaintiff sought emergency medical treatment for persistent back pain that radiated to his lower extremities. An x-ray of the lumbar spine indicated mild narrowing of the L1-2 and L5-S1 intervertebral disc spaces, slight anterior wedging of the L1 vertebral body, and mild curvature of lumbar spine.

On October 7, 2004, Plaintiff was treated at the emergency room for a severe migraine headache, lower back pain, and muscle spasms. He was admitted into the hospital two days later because his headache had persisted for six days. Because Plaintiff had a longstanding history of migraine headaches and reported that he was experiencing the "worst headache of his life," he underwent a lumbar puncture that produced few abnormal results. Plaintiff's symptoms included blurred vision, nausea, vomiting, and pain that was "so bad he c[ould] hardly talk." AR 323. At that time, he described his headaches, which began at age thirteen, as occurring twice a week and lasting two-to-three hours at a time and being associated with phonophobia (sensitivity to noise), photophobia (sensitivity to light), nausea, a throbbing sensation, bi-frontal head pain, and some visual changes. Plaintiff was prescribed a number of medications for his severe pain, including Vicodin and Morphine sulphate.

While he was hospitalized, Plaintiff also underwent a CT scan of the brain, which confirmed the presence of an eight millimeter focal hypodense area in the right mid-parietal region (differential diagnosis would include old lacunar infarction or arachnoid cyst), and diffuse bilateral periventricular hypodensities. An MRI of the brain performed at that time showed numerous globular and punctate areas of abnormal signals within the subcortical areas and deep white matter tracks. The radiologist noted that the MRI findings were indicative of "some type of demyelinating processing including multiple sclerosis" but that additional medical testing was required in order to

confirm the diagnosis. AR 449.

From November 2004 to December 2004, Plaintiff continued to be treated for migraine headaches and lower back pain. On November 1, 2004, he sought emergency medical treatment for a severe headache that included blurred vision and sensitivity to light symptoms. The next day, when Plaintiff sought follow-up medical treatment for his headache pain, he also complained of right lower back pain that radiated to his right side, including his groin area. On November 8, 2004, he once again sought emergency medical treatment for severe, radiating lower back pain and was prescribed Vicodin. Several days later, Plaintiff underwent a neurological evaluation for his migraine headaches. He reported that he typically experienced blurred vision, sensitivity to light, and had two headaches each day that lasted up to four hours at a time. On November 23, 2004, he was treated in the emergency room for sharp lower back pain that radiated to his groin area that had persisted for three days and was prescribed Vicodin. On December 10, 2004, Plaintiff sought emergency medical treatment for back pain and associated paresthesias.

In 2005, Plaintiff continued to seek treatment for chronic lower back pain. In January 2005, Plaintiff returned to the emergency room complaining of severe lower back pain, tenderness, and numbness. He was diagnosed with lumbar radiculopathy and prescribed Flexeril and Percocet. His straight leg raising test on the right was positive. In March 2005, Plaintiff was treated again for his back pain, which became worse after he twisted his back while he was doing the dishes. On April 12, 2005, after he slipped and fell on the steps of his home, Plaintiff was treated at the emergency room for complaints of lower back pain. An x-ray of the lumbar spine showed minimal degenerative changes at the L4-5 disc space. Between May and June 2005, Plaintiff was treated at the hospital on five separate occasions for severe back pain, lumbar radiculopathy, numbness, weakness, muscle

spasms, acute myofascial pain, paresthesias, and an episode of falling in the shower. In August 2005, Plaintiff was treated in the emergency room for tripping and falling, which caused him severe lower back pain. An x-ray of the lumbar spine indicated mild straightening of the normal lumbar lordosis that was likely secondary to a muscle spasm.

Plaintiff underwent additional treatment for his lower back pain and diagnostic testing for multiple sclerosis in 2006 and 2007. In February 2006, Plaintiff complained of continuing lower back pain. An August 23, 2006, MRI of the lumbar spine indicated abnormal cystic structures in the right neural foramen, lateral recess, and laminotomy defect at L5-S1, with the right S1 nerve root appearing to be compressed in the lateral recess. A January 23, 2007, MRI of the lumbar spine showed: (1) re-demonstration of a lobulated fluid-filled lesion at L5-S1, (2) a shallow central nuclear protrusion at L5-S1 contacting the left S1 nerve root and compressing the right S1 nerve root against the fluid-filled structure, and (3) narrowing of the right L5-S1 neural foramen. A CT of the lumbar spine confirmed a central nuclear protrusion and narrowing of the bilateral neural foramina at L5-S1.

In February 2007, Plaintiff was admitted into the hospital after he fell on ice and hurt his back, causing severe lower back pain. While he was hospitalized, he underwent a neurological evaluation, including diagnostic tests. While an MRA of the brain was normal, an MRI showed "multiple plaques all over the brain suggestive of multiple sclerosis" and a small chronic lacunar infarct of the right basal ganglion area. AR 517, 542. Plaintiff's final diagnoses upon discharge included multiple sclerosis, chronic back pain, and migraine headaches. That same month, Plaintiff was prescribed a cane, which he was required to use at all times to maintain his balance.

On April 18, 2007, Dr. J. Smejkal, a licensed physician for the SSA Disability Determination Bureau, performed a consultative evaluation of Plaintiff. The doctor noted that Plaintiff walked with

the assistance of a cane and had bilateral pain and tenderness in his hips. Dr. Smejkal assessed Plaintiff as having a restricted range of motion in the lumbar spine in lateral and forward flexion and on extension. Dr. Smejkal diagnosed Plaintiff as having back pain with restricted range of motion, a history of mini-strokes, migraine headaches, Osgood-Schlater disease, anxiety, and hypertension that was not controlled by medication.

On May 17, 2007, Dr. J. Sands, a state agency medical consultant, reviewed the medical evidence and assessed Plaintiff's physical residual functional capacity ("RFC") to perform work-related activities. He opined that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk at least two hours in an eight-hour workday (but required the use of a hand-held assistive device for ambulation), sit for about six hours in an eight-hour workday, and that he had limited pushing and pulling abilities in his lower extremities. Dr. Sands determined that Plaintiff was able to occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, but was unable to climb ladders, ropes, and scaffolds. Dr. Sands required Plaintiff to avoid concentrated exposure to hazards, including machinery and heights. On August 3, 2007, another state agency medical consultant reviewed Plaintiff's medical file and affirmed Dr. Sands's RFC assessment.

2.    *Mental Health*

On September 12, 2004, Plaintiff was hospitalized after a suicide attempt. Hospital notes indicate that Plaintiff suffered from stress and anxiety, was overwhelmed in public places, had difficulty relaxing, and had experienced auditory hallucinations since he was ten years old. Plaintiff was diagnosed with psychosis, poly substance abuse, and a social anxiety disorder. He was assessed as having a Global Assessment of Functioning ("GAF") score of 45 upon admission and a GAF

score of 55 upon discharge from the hospital.[2]  In September 2005, Plaintiff sought treatment for complaints of nerves and insomnia.  Between December 2006 and October 2007, Plaintiff sought psychiatric treatment for opiate dependency.

On April 25, 2007, Dr. Roger L. Parks, a licensed clinical psychologist for the SSA Disability Determination Bureau, performed a psychological consultative evaluation of Plaintiff. At that time, he noted that Plaintiff had a six-year history of panic attacks and that more recently, the attacks had been occurring on a daily basis.  Plaintiff's panic attacks took place both at home and in public, and were characterized by chest pain, blurred vision, numbness, and shortness of breath. Dr. Parks diagnosed Plaintiff as having a panic disorder with agoraphobia, multiple sclerosis, a herniated disc, migraine headaches, arthritis, and a GAF score of 60.

On May 11, 2007, Mary Jane Pugliese, a registered nurse for the SSA Disability Determination Bureau, contacted Plaintiff by telephone and completed an activity of daily living report.  In her report, Ms. Pugliese noted that Plaintiff could perform some minor household chores, which included washing dishes "up to three times a week" and cooking simple meals once a week. However, Plaintiff could not do laundry because he experienced difficulty walking and bending over made him feel lightheaded.  Ms. Pugliese reported that Plaintiff was able to leave his house two to three times per week and that on a weekly basis, he would walk a block to the local gas station using either his walker or cane to buy one or two small items.  He was also able to do some small errands,

---

[2]  The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Tex. Rev. 2000) ("DSM–IV–TR").  As is relevant herein, a GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.  Furthermore, a GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  *Id.*

which included picking up prescription medication from the local drug store.  Plaintiff grocery shopped every other week for approximately thirty minutes accompanied by his mother.  Ms. Pugliese noted that Plaintiff had some friends but that he typically did not "go anywhere socially." AR. 196.

On May 17, 2007, Dr. F. Kladder, Ph.D., a state agency psychologist, reviewed the medical record and completed a Psychiatric Review Technique form.  Dr. Kladder opined that Plaintiff suffered from a panic disorder with agoraphobia, which was non-severe, and that he had mild difficulties in maintaining social functioning.  He also noted that Plaintiff's current GAF score was 60.  On August 3, 2007, another state agency consultant reviewed Plaintiff's medical file and affirmed Dr. Kladder's assessment.

## C.     Mr. Clark's Testimony

At the administrative hearing, Plaintiff testified that he previously worked as a paper machine operator for a newspaper company, but he injured his back in 1999 when he attempted to lift a 150 pound pallet at work.  He could not maintain the paper machine operator job because it caused "too much stress" on his back and required him to constantly lift, bend, and stand.  AR 26. For a short period in 2008, Plaintiff worked as an attendant at a car wash, but the job required him to stand for long periods every day, which was too much for him, and he was unable to lift heavy objects.  He also worked as a telemarketer for a couple of weeks but the job required that he sit for eight hours a day, which caused him to experience back pain, and the computer he used also gave him sickening migraine headaches.  Furthermore, Plaintiff worked for about three months at a restaurant making pizzas and also worked for a home improvement company where he did door-to-door advertising for the company

Plaintiff explained that he was not able to sit all day and he could not stand for very long. He testified that he typically lies down two to three hours during the day, and when he is lying down, he lies on his side and places a pillow between his legs to alleviate the pressure on his back. Plaintiff has used a physician-prescribed cane to walk since his back surgery in 2004. He was diagnosed with Osgood-Schlatter as a child and still has pain in his knees. Plaintiff testified that he would occasionally walk one to two blocks to the nearest drug store. He also indicated that he could not afford to have additional medical testing for his back impairment because he did not have enough money or health insurance.

Plaintiff testified that he previously used drugs, but since October 2007 he has refrained from drug use. As a result, he no longer took prescription pain medication and did not feel well because he was in "pain every day, all day, all the time, no matter what [he did]." AR 35. Plaintiff experienced auditory hallucinations since the age of ten that told him to harm himself, but he had no suicide attempts after 2004. Furthermore, he testified that he did not want to be on disability permanently, and if awarded benefits, he planned on entering a vocational rehabilitation program.

**D.     Vocational Expert Testimony**

At the administrative hearing, the VE testified that, according to the Dictionary of Occupational Titles ("DOT"), the various jobs Plaintiff held ranged from medium, skilled work to light, unskilled work. The ALJ then posed a hypothetical to the VE, inquiring as to whether jobs existed for an individual who has a high school education but is limited to sedentary level work with a sit/stand option. Based on those limitations, the ALJ asked the VE if such an individual could perform the claimant's past work, and the VE responded in the negative. However, the VE identified other work that this hypothetical individual could perform, which included jobs as a

general office worker (2,200 jobs), order clerk (500 jobs), and information clerk (1,600 jobs).

Plaintiff's counsel also questioned the VE at the administrative hearing. Specifically, he asked the VE if there were any jobs that the hypothetical individual could perform if he would need to lie down for several hours during an eight-hour workday. In response, the VE stated that this individual would not be capable of engaging in substantial gainful activity. Additionally, the ALJ questioned the VE to find out if any work would exist if the individual missed more than two workdays per month, to which the VE stated that there would be no available work.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ

"uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart,* 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel,* 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue,* 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott,* 297 F.3d at 595)); *see also O'Connor-Spinner,* 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's reso RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform

despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (citing SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996); 20 C.F.R. § 404.1545(a)) (other citations omitted). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand of the ALJ's decision based on the following reasons: (1) the ALJ made an improper step three determination; (2) the ALJ made an improper RFC determination; and (3) the ALJ made an improper step five determination. The Court now considers each of the asserted grounds for reversal or remand in turn.

### A.     Step Three

Plaintiff first argues that the ALJ erred by failing to render a proper step three finding. Specifically, Plaintiff contends that the ALJ committed reversible error by failing to consider relevant medical evidence indicating that he satisfied Listings 1.04 (disorders of the spine) and 11.09 (affective disorders). Additionally, Plaintiff asserts that the ALJ erred in failing to discuss whether Plaintiff medically equals any listed impairments. In response, the Commissioner asserts that the ALJ's step three finding was proper because substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or medically equal the requirements of a listed impairment.

The determination of whether a claimant suffers from a listed impairment occurs at steps two and three of the ALJ's analysis. Step two of the ALJ's analysis requires an examination of whether the claimant has an impairment or combination of impairments that are severe. *See* 20 C.F.R. §§

404.1520(a)(4)(ii), 416.920(a)(4)(ii). A medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). Once the ALJ has evaluated whether the claimant has a severe impairment or combination of impairments, the ALJ proceeds to step three. At step three, the ALJ must determine whether the claimant's impairments meet an impairment listed in the appendix to the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). An individual suffering from an impairment that meets the description of a listing or its equivalent is conclusively presumed disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.") (emphasis in original); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. Ind. 2012) (claimant "had the burden of establishing that he met all of the requirements of a listed impairment").

An impairment that manifests only some of the criteria will not qualify, regardless of its severity. *See Sullivan*, 493 U.S. at 530. "Whether a claimant's impairment equals a listing is a medical judgment." *Barnett*, 381 F.3d at 670 (citing 20 C.F.R. §§ 404.1526(b)).

In the present case, the ALJ considered whether Plaintiff met Listing 1.04, which provides, in relevant part:

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc

16

disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A.[3] The ALJ also considered whether Plaintiff met Listing 11.09 for multiple sclerosis with: "A. Disorganization of motor function as described in 11.04B; or B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02 . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 11.09.[4]

Plaintiff argues that the ALJ failed to consider favorable evidence indicating he met the listings and that the two sentences the ALJ provided do not adequately explain the rationale behind his determination that Plaintiff did not satisfy either listing. The Commissioner defends the ALJ by emphasizing that two reviewing state agency physicians found that Plaintiff did not have a listing-level impairment. Furthermore, the Commissioner asserts that, while the record reflects the presence of some listing requirements at various examinations, most of Plaintiff's medical examinations did not reveal medical evidence that would satisfy the listings.

The entirety of the ALJ's analysis at step three states:

The undersigned has taken Section Listing 1.02, 1.04 and 11.09 into consideration. But, based on a comparison of the requirements of the Listings of Impairments by the State Agency consultants, the undersigned Administrative Law Judge finds that the claimant does not have any impairment that meets the criteria of any impairment in

---

[3] Because Plaintiff asserts in his brief that Listing 1.04A is the applicable listing, the Court cites only that portion of Listing 1.04.

[4] Because Plaintiff asserts in his brief that Listing 11.09A and 11.09B apply, the Court cites only those portions of Listing 11.09.

the Listings of Impairments.

R. 58. There is no additional explanation provided. An "ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record." *Ribaudo*, 458 F.3d at 584 (citing *Scheck*, 357 F.3d at 700-01). Plaintiff argues that the record contains contradictory information and therefore requires more explanation of why Plaintiff does not satisfy Listings 1.04 and 11.09.[5]

The record contains evidence indicating that Plaintiff's impairments may satisfy Listing 1.04. The Commissioner concedes that there is evidence in the record of compromised nerve root, reduced range of motion, muscle weakness, and sensory or reflex abnormalities on some occasions. Additionally, there is evidence in the record of positive straight leg tests and neuro-anatomic distribution of pain related to Plaintiff's lower back impairments. Despite such evidence, the Commissioner contends that the ALJ's decision is supported by some instances where abnormalities were not noted. However, most of the medical evidence the Commissioner relies on originated in 2004 or 2005 and conflicts with more recent medical evidence from 2007. Furthermore, the only recent medical evidence that supports the Commissioner's argument that muscle strength has been noted as excellent or good is in direct conflict with a different physician's notes from an examination the same year that found weakness in muscle strength. The ALJ did not provide an adequate explanation regarding why the evidence was insufficient to meet the Listing. Consequently, the Court remands this case on the issue of the ALJ's analysis under Listing 1.04 and directs the ALJ to consider all evidence in the record and build a logical bridge between the evidence and his conclusion, specifically addressing Listing 1.04A for disorders of the back.

---

[5]Plaintiff does not challenge the ALJ's determination regarding Listing 1.02.

18

Although the ALJ also erred in failing to explain why Plaintiff did not satisfy Listing 11.09 for multiple sclerosis, the ALJ's error is harmless. Although Plaintiff has been diagnosed with multiple sclerosis, he has not met his burden of establishing the other listing requirements. Specifically, Plaintiff has not proved that he has "[s]ignificant and *persistent* disorganization of motor function in *two* extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" a Listing 11.09(A) requires. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.04(B) (emphasis added); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.09(A). While Plaintiff exhibits gait disturbance requiring a cane for ambulation, there is no medical evidence in the record that *two* of his extremities are prone to persistent disorganization of motor function, as required. As for 11.09(B), there is no medical evidence in the record to establish that Plaintiff has a visual impairment, so Plaintiff argues that he has a mental impairment that satisfies Listing 12.02(C). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.09(B) (defining disability for multiple sclerosis with "Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02 . . ."). However, although Plaintiff experiences anxiety and depression, he has not provided any medical evidence to support a finding that his anxiety or depression are *caused by* his Multiple Sclerosis as Paragraph B of Listing 11.09 requires. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00E (describing the multiple sclerosis listing criteria and asserting that "[p]aragraph B provides references to other listings for evaluating visual or mental impairments *caused by* multiple sclerosis") (emphasis added). Consequently, this Court does not grant Plaintiff's request for remand as to the ALJ's finding that Plaintiff did not satisfy the requirements of Listing 11.09.

Plaintiff also argues that the ALJ erred in failing to discuss whether Plaintiff's combination of impairments medically equal any listed impairment. If a claimant has a combination of

impairments, each failing to meet a listing alone, the ALJ is to "compare [his] findings with those for closely analogous listed impairments" and "[i]f the findings . . . are at least of equal medical significance to those of a listed impairment, [the ALJ] will find that [the claimant's] combination of impairments is medically equivalent to that listing." 20 C.F.R. § 404.1526(b)(3). Even if the ALJ properly found that Plaintiff's impairments were not disabling on their own, "that would only justify discounting their severity, not ignoring them altogether." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The Seventh Circuit has repeatedly "reminded the agency that an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation." *Id.* (listing cases). Plaintiff has several impairments other than his multiple sclerosis and lumbar radiculopathy, including Osgood-Schlatter disease, chronic headaches, anxiety, and depression. On remand, the ALJ is directed to consider the cumulative effect of Plaintiff's impairments and provide an explanation as to whether the combination medically equals any listed impairment.

**B.      Residual Functional Capacity**

Plaintiff next contends that the ALJ made an improper RFC finding because he failed to properly weigh and consider all the evidence, thereby failing to account for all of Plaintiff's limitations. First, Plaintiff asserts that the ALJ impermissibly ignored evidence related to his post-surgery back impairments. Second, Plaintiff argues that the ALJ erred in failing to incorporate his migraines into the RFC despite evidence in the record indicating Plaintiff's migraines caused blurred vision, nausea, vomiting, and sensitivity to light and sound. Next, Plaintiff asserts that it is unclear what weight the ALJ gave to Plaintiff's prior use of drugs and alcohol. Fourth, Plaintiff contends that the ALJ did not resolve the inconsistency between his Step Two finding that Plaintiff's anxiety

and depression are severe and his RFC finding that Plaintiff's anxiety and depression are non-severe.

Fifth, Plaintiff argues that the ALJ placed undue weight on his ability to engage in activities of daily

living. Sixth, Plaintiff asserts that the ALJ erred in failing to incorporate his moderate impairment

in social functioning into the RFC because the impairment precludes him from performing the order

clerk and information clerk positions. Last, Plaintiff contends that the ALJ impermissibly failed to

include in his RFC Plaintiff's reliance on a cane to ambulate and need to avoid concentrated

exposure to hazards, such as machinery and heights. In response, the Commissioner asserts that

substantial evidence supports the ALJ's RFC.

The RFC is a measure of what an individual can do despite the limitations imposed by his

impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision

rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an

issue at Steps Four and Five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184 (Jul.

2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant

evidence of an individual's ability to do work-related activities." *Id*. at *3. The ALJ's RFC finding

must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. In arriving at an RFC, the

ALJ "must consider all allegations of physical and mental limitations or restrictions and make every

reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p at

*5. In addition, he "must consider limitations and restrictions imposed by all of an individual's

impairments, even those that are not 'severe'" because they "may - when considered with limitations

or restrictions due to other impairments - be critical to the outcome of a claim." *Id*.

First, Plaintiff argues that the ALJ impermissibly ignored evidence regarding Plaintiff's post-

surgery back impairments. Specifically, the ALJ asserted that since Plaintiff's 2004 surgery,

medical evidence failed to support allegations of functional limitations. The ALJ relied on medical evidence from 2004 and 2005, as well as the 2007 opinion of state agency physician Dr. Smejkal, but ignored evidence that was favorable to Plaintiff from the same time periods. For example, the ALJ relied in part on a 2004 report from Dr. Spott indicating that Plaintiff's surgery appeared to be successful but ignored evidence that Plaintiff subsequently returned to the doctor on numerous occasions seeking treatment for back pain. Similarly, the ALJ relied on Dr. Smejkal's opinion that Plaintiff's lower extremities were normal, but completely ignored two lumbar MRIs that both demonstrated nerve root compression at S1. Furthermore, although the ALJ discussed 2004 and 2005 evidence of "mild" abnormalities, he failed to even mention evidence of more significant limitations, such as evidence of lumbar radiculopathy (acute sciatica). An ALJ cannot "ignore an entire line of evidence that is contrary to h[is] findings." *Zurawski*, 245 F.3d at 888 (quoting *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir.1999)). On remand, the ALJ is directed to build a logical bridge between the medical evidence and the RFC, addressing and resolving inconsistencies in medical evidence.

The ALJ also failed to resolve the inconsistency between his step two finding that Plaintiff's anxiety and depression are severe and his RFC finding that Plaintiff's anxiety and depression are non-severe. The ALJ did not address Plaintiff's GAF scores or his suicide attempt in his RFC determination. Additionally, although the ALJ acknowledged Plaintiff's moderate difficulty in social and occupational functioning, he did not incorporate it into his RFC finding. On remand, these inconsistencies must be resolved.

Plaintiff also argues that the ALJ erred in placing undue weight on Plaintiff's ability to engage in some activities of daily living. On remand, the ALJ is admonished to keep in mind the

Seventh Circuit's repeated reminder that

> [t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (explaining that a plaintiff's ability to complete activities of daily living does not mean that he can manage the requirements of the workplace). Furthermore, the Seventh Circuit has repeatedly criticized credibility determinations that are based on a plaintiff's ability to take care of his personal hygiene, children, or household chores, as these alone are not sound bases for a credibility determination. *See, e.g., Zurawski*, 245 F.3d at 887 (asserting that daily activities, such as doing laundry, helping children prepare for school, cooking, and washing dishes do not necessarily undermine or contradict a claim of disabling pain); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2006) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand.").

Plaintiff argues that the ALJ erred in failing to incorporate his migraines into the RFC finding. The record is replete with indications that Plaintiff suffered from headaches, but, despite mentioning his repeated treatment for migraines, the ALJ did not explain why he did not incorporate headaches into his RFC finding. On remand, the ALJ is directed to incorporate Plaintiff's headaches into the RFC finding or explain why they are not included.

Plaintiff also contends that the ALJ impermissibly failed to include in his RFC Plaintiff's reliance on a cane to ambulate and need to avoid concentrated exposure to hazards, such as

machinery and heights.  On remand, the ALJ is directed to incorporate Plaintiff's use of a cane and need to avoid hazards into the RFC finding or explain why they are not included.

## C.    Step Five

The Court need not reach Plaintiff's contention that the ALJ's step five finding was improper because the Court is remanding the case for the errors described above.  However, the Court does note that Plaintiff's arguments that the ALJ failed to determine whether the VE's testimony about the requirements of the order clerk job were consistent with the DOT are premised on the requirements set forth in DOT # 209.567-014, but the requirements for the order clerk position described by the VE are actually set out in DOT # 249.362-026.  On remand the ALJ is reminded that he must incorporate all relevant limitations in his questioning of the VE and specifically ascertain whether the cited jobs are consistent with the limitations in the RFC as well as the DOT.

## D.    Remedy

Plaintiff requests that the Court reverse the Commissioner's decision and remand for an award of benefits.  An award of benefits is appropriate "only if all factual issues have been resolved and the record supports a finding of disability."  *Briscoe*, 425 F.3d at 356.  In this case, the ALJ failed to develop the record and draw a logical bridge from the evidence to his conclusions. Additionally, although Plaintiff requests an award of benefits, he fails to present a developed argument in favor of doing so.  The ALJ must resolve inconsistencies in the medical record and fully explain how all of Plaintiff's limitations are incorporated into the RFC.  These are issues that can only be resolved through further proceedings on remand.  Accordingly, this matter is remanded for further proceedings.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief requested in Plaintiff's Memorandum in Support of Summary Judgment or Remand [DE 18] and **REMANDS** this matter for further proceedings consistent with this opinion.

SO ORDERED this 22nd day of March, 2013.

s/ Paul R. Cherry _____
MAGISTRATE JUDGE PAUL AR. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record